In 1925 complainant assigned to defendant application No. 738433 for United States letters patent relating to pumping units for oil burners used in house heating. Other applications and one patent, No. 1481573, were also assigned, but they are of no consequence in these suits. The defendant agreed to pay complainant royalties based on the number of burners manufactured by it "under the letters patent No. 1481573 or under the letters patent which may be granted upon the applications for letters patent hereinbefore referred to." Complainant contends that defendant was thereby required to pay royalties for burners manufactured under application No. 738433 before a patent was granted thereon. That question I will consider later. The defendant also agreed, in case it did not start to manufacture "under letters patent and patents pending hereinbefore referred to" within two years, that it would reassign to complainant the patent and applications. *Page 283 
In February, 1927, complainant filed its bill in the first of these causes praying for an accounting of royalties. Defendant answered, denying that its oil burners were manufactured under the application. Complainant served interrogatories and defendant reiterated its denial under oath. Meanwhile, more than two years had elapsed since the date of the agreement between the parties. Then, in November, 1927, complainant filed the bill in the second of these causes, praying that defendant be decreed to reassign the application on the ground that defendant had not started to manufacture under it within two years. Defendant answered, admitting the material allegations of the new bill, the reassignment was decreed and was duly executed and delivered. Complainant noticed its first suit for final hearing and was met by a supplemental answer pleading the decree in the second suit to establish conclusively that defendant had not manufactured under the application, and hence could owe no royalties. To avoid this defense, complainant filed a petition that the decree be vacated on the ground of fraud. Vice-Chancellor Bentley decided that the accounting bill must be dismissed if the decree should stand and that the decree could be vacated only for some special equity in favor of complainant. The equity alleged was fraud, namely: That the defendant, although it had, in fact, manufactured oil burners under the patent application, falsely denied this fact in its pleadings and in its answers to the interrogatories and thereby deceived complainant and lead it to take the decree which established that defendant had not manufactured under the application. Much of the evidence which would be material on the question so raised, would also be material to the issues in the accounting suit — if the decree were vacated — and so the vice-chancellor directed the two hearings to be held together. At the conclusion of the complainant's case, the vice-chancellor was in doubt whether aprima facie case had been proved. It appeared that the defendant's case, largely evidence of a technical nature, would consume much time of the court as well as of counsel and witnesses and therefore defendant was permitted to reserve its evidence until the court might determine *Page 284 
whether complainant had made a prima facie case. The untimely death of Vice-Chancellor Bentley prevented him from deciding this question.
The provision for the payment of royalties contained in the agreement between the parties reads: "The party of the second part [defendant] agrees to pay to the party of the first part [complainant] a royalty or shop-right fee of $17.50 for each complete oil burner sold by the party of the second part, the pumping unit and/or the control box unit of which is manufactured by the party of the second part under the letters patent No. 1481573, or under the letters patent which may be granted upon the applications for letters patent hereinbefore referred to, provided, however, that no royalty or shop fee shall be paid by the party of the second part to the party of the first part upon any oil burner manufactured and sold, payment for which cannot be obtained due to a defect or defects in such oil burner, which precludes its proper functioning." Defendant, relying on the actual words employed, contends that no royalties were payable by it even if it manufactured oil burners in accordance with the specifications of application No. 738433, because no patent was granted on the application until after the bill for an accounting was filed and until after the application had been reassigned to complainant pursuant to the decree in the second suit; that royalties were not payable until a patent should be obtained; that royalties were payable only on burners manufactured "under the letters patent No. 1481573 or under the letters patent whichmay be granted upon the application." Complainant, to meet this contention, seeks to eliminate the words in italics and urges that the agreement should be interpreted as if it provided for a royalty for each oil burner manufactured "under the letters patent No. 1481573 or under the applications for letters patent hereinbefore referred to." The difficulty with this interpretation is that it does not fit the words actually used; it is not the covenant which defendant made. The bill does not pray for a reformation.
The agreement that royalties should not begin until the *Page 285 
grant of the patent, was not entirely unreasonable. Until then, the inventor or his assigns had no monopoly; any competitor was at liberty to use Grant's invention. Until a patent should be granted, the patentability of the apparatus was doubtful. The history of the application is instructive. It was filed in the patent office September 18th, 1924, containing nine claims of novelty as the basis for a patent. In December, every claim was rejected by the patent examiner. This was the situation when the application was assigned to defendant. During the three years defendant held the application, it four times filed amended statements of its claims in the hope of defining some patentable feature of Grant's oil burner. The first three amendments were promptly rejected; the last was still awaiting the action of the patent office when the application was reassigned to complainant; two weeks later, it too was rejected. Complainant prepared new drawings and specifications and new claims to support the patent, amended them for the last time, and finally, on February 15th, 1929, a patent of limited scope was granted.
I find that upon a proper construction of the agreement, complainant is not entitled to royalties; but assuming that I am mistaken in this respect, I take up the other points in controversy, and first, whether defendant manufactured oil burners under application No. 738433. The application, as noticed above, was amended several times; the specifications were changed in detail; the claims were radically altered and greatly narrowed. It might well be that the burners manufactured by defendant would not infringe the patent granted and yet came within the scope of the claims originally filed. In my opinion, if the machines manufactured by defendant were substantially the same as the machine described in the specifications in the particulars set forth in any one of the claims of the application as the application read at the time of the assignment, then the defendant's machines were manufactured "under the application," regardless of later amendments. The meaning and effect of the contract were not altered by subsequent happenings. I think it is also immaterial whether or not the claims of the application *Page 286 
relied on by complainant lacked novelty or were not a valid basis for a patent. All oil burning apparatus for house heating have some features in common. The burners made by defendant are, of course, like those described in the application in some respects and they are different in other respects, but I think the two machines are substantially alike and that the defendant's apparatus comes within the first claim of the application, namely, "a fuel generator comprising a casing having a mixing chamber and means operating therein arranged to simultaneously draw oil and air into said chamber, to mix the oil and air, and deliver the same to a burner." The evidence presented by complainant shows prima facie that defendant did make oil burners under the application and hence that its answers above mentioned were false.
The next question is whether the complainant was deceived, for if complainant knew that defendant's statements were false, or if it was not deceived by them, it cannot have relief on the ground of fraud.
A Mr. Albert E. Grant is the inventor of the devices shown in the application. He has been the principal stockholder of complainant and its president throughout its corporate existence; he executed on its behalf the agreement with defendant; his affidavit verifies the bill of complaint in the second cause as well as the petition to open the decree. As soon as the patents were assigned to defendant in 1925, he entered the employ of defendant and remained in its employ until a few weeks before the complainant's first bill was filed. While in the service of defendant, he designed for it an oil burner and superintended the manufacture of burners according to his design. These are the burners which complainant says were made under application No. 738433. When complainant took its decree, it knew, as well as did the defendant, the exact design of the defendant's oil burners and the precise points of similarity and dissimilarity between those burners and the one described in the application. There has never been any dispute between the parties as to the primary facts. The question between them has been one of opinion as to the degree and effect of the similarity between the two *Page 287 
machines. The defendant denying that it had manufactured under the application and the complainant asserting the contrary, each expressed an opinion, founded on undisputed facts which had all along been fully known to the opposite party. I am aware that in infringement suits, the question of the similarity of two appliances is regarded as a question of fact for the jury.Coupe v. Royer, 155 U.S. 565; 15 Sup. Ct. Rep. 199. But there is a wide difference between a representation "with respect to a specific fact or facts susceptible of exact knowledge" and one concerning a condition of affairs and taken "as meaning no other than a strong belief founded upon what appeared to the defendant to be reasonable and certain grounds." Cowley v. Smyth,46 N.J. Law 380, 389; Garrison v. Technic Electrical Works,59 N.J. Eq. 440; affirmed, 63 N.J. Eq. 806. On such a belief or opinion set forth in the defendant's pleadings and in its answers to the interrogatories, complainant could rely only at its peril; the parties were at arm's length actively engaged in litigation, each represented by eminent counsel. Industrial Savings and LoanCo. v. Plummer, 84 N.J. Eq. 184. There is insufficient evidence, I may add, to prove that defendant falsely pretended to believe that it had not manufactured under the application, whereas in truth it knew or had an opinion to the contrary. To this day it stoutly maintains with much show of reason that its apparatus is not covered by the application.
It is clear to my mind that complainant was not in any manner deceived. I deduced this not only from the knowledge which the complainant had of the basic facts but from the course of this litigation. The answer of defendant to the second bill of complaint is the document which complainant says finally convinced it that defendant had never used the patent application. It was filed on or just before February 23d 1928, when the decree in that suit was entered. If complainant had really been convinced, it would then have dismissed its bill in the accounting suit. Instead, on May 31st, 1928, it noticed that suit for final hearing. If complainant had been deceived into believing that defendant had *Page 288 
not used the invention, there would have been testimony showing when and how, between February 23d 1928, and May 31st, 1928, it learned of the deception and discovered the truth. There is no such evidence. The testimony of complainant's principal witness, its president, Mr. Grant, was based wholly on knowledge acquired by him in 1925 and 1926. If complainant had, indeed, been deceived and then, upon discovery of the deception, proceeded with its action for an accounting, it would have moved to vacate the decree promptly on learning of the fraud. Instead, it failed to do so until after defendant, in 1929, urged the decree as an estoppel.
I think the true situation in this: Complainant thought it could have both a decree for the reassignment of the application and a decree for an accounting of the loyalties. It did not foresee that the former would bar the latter and so it elected to take advantage of defendant's statement that it had not used the invention, although complainant then knew, or thought the statement was false. With full knowledge of the situation, it elected to take the decree. The charge of fraud was invented when the bar of the decree was raised because it seemed the only likely way in which complainant could prevail. The petition to open the decree will be dismissed, as will the bill for an accounting.